OPINION
Defendants-appellants, Ronald Rieser and Cynthia Rieser, appeal from a judgment of the Franklin County Court of Common Pleas awarding monetary damages and attorney fees to plaintiffs-appellees, Nicholas Hanson and Roxanne Hanson.
Appellees filed this action seeking to recover for alleged fraudulently concealed defects in a home purchased from appellants. Other defendants in the action who are not parties to the present appeal were a real estate agent, Erie Hull ("Hull"), and the brokerage for which he worked, GPS Realty, Inc. ("GPS"). Both Hull and GPS settled with appellees and were not subject to the judgment appealed from.
The Hansons purchased the home in question, 6525 Birch Park Drive, Galloway, Ohio, from the Riesers in March 1995. Hull and GPS served as buyer-brokers in the transaction, representing the Hansons. The home was uniformly portrayed at trial as an inexpensively-built ranch design, wood framed, with a truss framed roof. The habitable area of the house is entirely built over a crawl space, and there is no full basement. There are several crawl space vents located in the outer foundation walls to provide ventilation. The crawl space contains the water meter, water supply and waste water pipes, and electric wiring. The computer multiple listing service ("MLS") listing drafted when the property was placed for sale contains, under the rubric "BAS" for basement, the notation "C," to indicate the crawl space. In connection with the sale, both Ronald and Cynthia Rieser signed the Residential Property Disclosure Form mandated by R.C. 5302.30. One section of this form states: "Do you know of any movement, shifting, deterioration, material cracks (other than visible minor cracks or blemishes) or other material problems with the foundation, floors, or interior/exterior walls?" Under this section, the box "No" was checked.
Roxanne Hanson testified that she first saw the house in March 1995, when Hull showed it to her and her husband. Hull did not show her the multiple listing card for the home at that time. While they were looking at the interior of the home, Mrs. Hanson asked Hull how to get under the house, and Hull said that it was not possible. At that time, she did not know what form a crawl space might take, and expected to find a doorway in a wall if any access beneath the house was available.
Mrs. Hanson testified that she was still unaware of any access to the underside of the house after she and her husband took possession. In May 1995, the water meter reader came to the house and asked to compare the outside and inside meters. Mrs. Hanson told him that she did not know where the inside meter was located, and he stated that, based upon his experience in the neighborhood, it would be in the crawl space. The water meter reader then showed her the probable location of a crawl space access in the closet of the back bedroom. Together they pulled up the carpet, which was tacked down, and used a screwdriver to lift up a flush-fitted board which covered an opening into the crawl space. In order to remove enough carpet to expose the trap, they had to remove the closet doors. The water meter reader then went down into the crawl space with a flashlight, checked the meter, and left. Mrs. Hanson replaced the carpet and closet doors.
Some months thereafter, Mrs. Hanson testified, her husband went into the crawl space because he thought that her brother might have stored Christmas wrapping paper there. At this time, Mr. Hanson first noticed that a "camper jack," commonly used to level camping trailers, was braced on a pair of cement blocks and appeared to be supporting the floor of the house. A few months later, Mrs. Hanson testified, she and her husband began to notice cracks around the inside walls of the bathroom and in the kitchen at the joint between the walls and ceiling. They also noted dampness in the garage ceiling, and puddles on the garage floor after hard rains. Mrs. Hanson testified that the cracks worsened over time, and that the interior walls were separating markedly from the ceiling. A contractor was contacted at one point, and informed them that a truss had been cut in connection with the installation of a wood stove chimney, and that a leak was causing the moisture in the garage. Her husband temporarily patched the roof leak, but they undertook no permanent repairs at that time. On cross-examination, Mrs. Hanson testified that, although the contract for their purchase of the home gave them a ten-day period for property inspection, she and her husband had not hired a residential property inspector to examine the home, but relied upon their own observations, the disclosure furnished by the sellers, the representations of their realtor, and the FHA inspection in connection with their financing.
Nicholas Hanson's testimony largely corroborated that of his wife with respect to their purchase of the home and discovery of the crawl space with the assistance of the water meter reader. Mr. Hanson testified that he had seen the home twice on the same day prior to purchasing it, and that his wife had only seen it on the second occasion, when he returned with her and the realtor. On the first occasion when he visited the house with the realtor, it was daylight, but snow accumulated in bushes around the house prevented him from noticing the crawl space vents. When he later returned with his wife, it was dark and the exterior of the house was not visible, so they did not make an external view of the house. Mr. Hanson testified that he had not personally entered the crawl space until some eight months after they had purchased the house, at which time he noticed the camper jack braced under the floor joist. He stated that he had not placed the jack there himself, nor had anyone connected with him done so. Over time, the cracks between the interior walls and the roof widened until they were nearly big enough to insert a finger.
Mr. Hanson also testified about the leak over the garage, which he had attempted once to caulk unsuccessfully. He testified that, at the time of trial, the leak was still present and causing water to run into the garage.
Ronald Rieser testified that he originally moved into the home in August 1982, and that it was new at that time. In the fall of 1982, he installed a large wood burning stove and used it to heat the home in winter. He used instructions given to him by his insurance company on safely installing a wood burning stove, including building a platform beneath to distribute the weight, and installing a ceramic surface on top of this platform. He estimated the stove's weight at three hundred pounds based upon his experience of carrying it into the house, with the additional weight of the installation including the framed platform, surface brick, and fire brick within the stove. His estimate was that his stove weighed less than his waterbed, which he had installed in his bedroom in the house without problem. Shortly after installing the stove, Mr. Rieser installed wooden bracing in the crawl space across the floor joists under the wood burning stove. Later, in 1985, a termite inspector pointed out that this wooden bracing in contact with the ground presented a termite hazard. Mr. Rieser thereafter removed the vertical portions of the bracing that were in contact with the ground, but left a horizontal member toenailed beneath the floor joist. He stated that he had once stored in the crawl space a camp jack similar to the one found there by appellees, but that he had never installed it to brace the floor and merely kept it there for storage.
Mr. Rieser further testified that during the time he lived in the home he never noticed any deflection or change in the floor around the wood burning stove. The only cracks that ever appeared were small cosmetic cracks in the joints where the interior partition walls met the ceiling. These cracks were easily repaired by caulking when he painted, which he stated he had done once or twice during his thirteen-year occupancy of the home. In 1988, he noticed a small roof leak which he fixed, and which did not remanifest itself at any time prior to the sale in 1995. To his knowledge, his wife Cynthia had never been in the crawl space after moving into the home in 1986. She was unfamiliar with his installation of the wood burning stove and he felt that she had no knowledge of any defect in the house.
Cynthia Rieser testified briefly in corroboration of certain aspects of her husband's testimony. She stated that she had moved into the house in 1986, and was familiar with the crawl space access in the back bedroom closet, but had never entered the crawl space. She had looked down into the access when it was opened by other persons, out of curiosity. She was unaware of any problems with the leak over the garage at the time of the sale.
Both parties presented expert testimony at trial. Appellants' expert witness was a Fred Casciani, a mechanical engineer. He testified as to his familiarity with framed structures and truss engineering. He had never seen or inspected the Rieser's former home. He presented his opinion based upon drawings and descriptions of the structure, and on an inspection report prepared by another engineer who had personally undertaken an inspection of the property. Casciani's expert opinion was that the gaps between interior walls and ceiling were not caused by deflection of the floor joists beneath the walls, but rather by elevation of the ceiling above. This was caused by normal seasonal variations in temperature and humidity, which caused the roof truss members to bow upwards. Any interior plaster cracks caused by this movement would be minor and easily repaired with spackling and paint. Any movement in the trusses was exacerbated by the Hanson's failure to promptly repair the long-standing roof leak, which would cause increased humidity in the attic space, and saturation of the insulation. Since the bottom chord of the truss was covered by the insulation blanket, there would be a great differential in wood moisture content between the top and bottom of the truss with corresponding upward deflection of the truss. This situation would cause greater interior cracking. He also opined that the home's floor was designed to carry a load of fifty pounds per square foot, and that it was structurally sound for any load it presently bore even without the support of any wood bracing or the camper jack beneath it.
Appellees' expert witness was Gary Chapman, a general contractor with extensive experience in residential home construction and remodeling. He had personally examined the home, including the crawl space and attic areas. In his opinion, the cracking around the interior walls and ceiling was caused by deflection of the floor joists underneath the wood stove. Chapman testified that a wood stove of the size and weight in question, on a ceramic platform, should be supported by a concrete footer and cement block wall installed in the crawl space directly beneath the stove. In his opinion, the failure to support the stove constituted a significant structural defect in the home.
Chapman went on to testify about the various projected expenses in remedying the defect in the home. He separated his estimates out into two possible approaches, one involving first-class renovation using professional labor, and the other having the homeowners do as much of the work as possible themselves.
The trial court delivered an oral decision from the bench. The court initially concluded that appellants were not liable for any defect resulting from the leak in the roof over the garage, because this did not constitute a latent defect. The court found that the attic access in the garage made the attic area accessible to reasonable inspection by the buyers, and that any leak, as well as any inadequate carpentry associated with installation of the stove flue, constituted open and obvious conditions which should have been detected by the buyers.
In contrast, the trial court found that the entrance to the crawl space, located in a bedroom closet tacked down by wall-to-wall carpeting, was not open and obvious. As a consequence, any defect visible only from the crawl space, such as the prior existence of supports under the wood burning stove, did not constitute an open and obvious defect discernable through a reasonable inspection of the home by the buyers.
The trial court chose to believe the testimony of appellees' expert regarding the source of the cracks around the interior walls and thus determined these to result from deflection in the floor joists. The court also found Ronald Rieser's testimony that he had not installed the camp jack underneath the stove "not credible," and found that it was a reasonable inference that Mr. Rieser, as the owner and occupant of the home, had placed the camp jack in position to replace the former wooden bracing in the crawl space. The court noted that appellants' expert had never personally visited the house. Because the expert's own testimony was that the cracks would expand and contract with changes in seasons and temperatures, and the cracks actually experienced by appellees tended only to expand, the explanation furnished by appellants' expert was not credible in the eyes of the court.
Based upon these conclusions, the court concluded there was a latent structural defect in the house of which appellants had actual knowledge, that the defect should have been disclosed, and had not been disclosed. The court further found that the Riesers had intended to mislead the Hansons and that the Hansons had relied to their detriment upon these misrepresentations.
The court ordered damages in the amount of $6,409, the cost of restoration based upon the testimony of Gary Chapman. The court declined to award punitive damages, but did award attorney fees in an amount to be determined at a later date.
In a judgment entry filed on March 5, 1998, the court journalized its judgment in favor of appellees for compensatory damages in the amount of $6,409. The court appended a photocopy of the transcript of its prior oral decision from the bench. After a subsequent fee hearing, the court awarded $2,475 in attorney fees on April 1, 1998. On July 8, 1998, the court entered a judgment denying appellants' motion for contribution from the other defendants, with whom appellees had settled. On October 1, 1998, the trial court entered judgment for appellants in the total amount of compensatory damages and attorney fees of $8,884.
Appellants have timely appealed and bring the following assignments of error:
Assignment of Error No. 1
 The verdict of the trial court is against the manifest weight of the evidence that the crawl space was open to observation, the purchaser had unimpeded opportunity to examine the property, there was no structural defect, there was no fraudulent concealment, therefore, the Plaintiffs/Appellees failed to prove each and every element of fraud and the trial court further erred by misconstruing the meaning and intention of the Residential Property Disclosure Form, by relying on and then misunderstanding the testimony of Plaintiffs' expert, and construing facts not in evidence unfavorably towards the Defendants/Appellants.
Assignment of Error No. 2
 The trial court's [sic] erred in its Judgment Entry filed on March 5, 1998 as it entered judgment against both Defendants Ronald Rieser and Cynthia Rieser without specific findings of joint liability or other shared liability.
Assignment of Error No. 3
 The trial court erred when it denied the Defendants, Ronald and Cynthia Rieser's Request For findings of Fact And Conclusions Of Law Defendants had timely filed the request and the trial court did not comply with the Requirements of Civ. R. 52.
Assignment of Error No. 4
 The trial court erred as a matter of law when they did not recognize the agency relationship that the Appellees established with their real estate licensee and the FHA Inspector/Appraiser.
In order to ease a discussion of the issues, appellants' assignments of error will be addressed out of numerical order. Appellants' third assignment of error asserts that the trial court erred when it refused to grant their motion for findings of fact and conclusions of law. Civ.R. 52 provides in pertinent part as follows:
 When a request for findings of fact and conclusions of law is made, the court, in its discretion, may require any or all of the parties to submit proposed findings of fact and conclusions of law; however, only those findings of fact and conclusions of law made by the court shall form part of the record.
* * *
 An opinion or memorandum of decision filed in the action prior to judgment entry and containing findings of fact and conclusions of law stated separately shall be sufficient to satisfy the requirements of this rule and Rule 41(B)(2).
The purpose behind the separate findings of fact and conclusions of law provided for under Civ.R. 52 is to aid appellate review of the trial court's decision and to clarify issues for potential resjudicata and estoppel applications. Giurbino v. Giurbino (1993),89 Ohio App.3d 646. If a court's ruling or opinion, considered in conjunction with the record at trial, provides adequate basis upon which we may review the legal and factual issues upon appeal, there is substantial compliance with Civ.R. 52, and, thus, no reversible error. In re Fetzer (1997), 118 Ohio App.3d 156. In the present case, the trial court appended a copy of its detailed oral decision to its judgment entry. This decision by the trial court contains sufficient review of the pertinent facts and conclusions of law to permit appellate review of all issues raised by appellants. We therefore find that the trial court substantially complied with Civ.R. 52 when it overruled appellants' motion for findings of fact and conclusions of law on the basis that findings of fact and conclusions of law were contained in the decision appended to the judgment entry. Appellants' third assignment of error is accordingly overruled.
Appellants first and second assignments of error address interrelated issues and will be discussed together. Appellants' first assignment of error asserts that the judgment of the trial court is against the manifest weight of the evidence; the second assignment of error essentially asserts that judgment against Cynthia Rieser, individually, is even less supported by the evidence.
When reviewing a trial court's decision on a manifest weight of the evidence basis, we are guided by the presumption that the factual findings of the trial court were correct. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass
(1967), 10 Ohio St.2d 230, paragraph one of the syllabus. The rationale for this presumption is that the trial court is in the best position to evaluate the evidence by viewing witnesses and observing their demeanor, voice inflections, and gestures.Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77. Thus, judgments supported by some competent, credible evidence going to all the essential elements will not be reversed by a reviewing court as being against the manifest weight of the evidence. C.E.Morris Co. v. Foley Const. Co. (1978), 54 Ohio St.2d 279.
Prior to the enactment to R.C. 5302.30, disclosure of defects in residential property sales was governed in Ohio by the common law rule of caveat emptor as set forth in the syllabus ofLayman v. Binns (1988), 35 Ohio St.3d 176:
 The doctrine of caveat emptor precludes recovery in an action by the purchaser for a structural defect in real estate where (1) the condition complained of is open to observation or discoverable upon reasonable inspection, (2) the purchaser had the unimpeded opportunity to examine the premises, and (3) there is no fraud on the part of the vendor.
Under the doctrine, the seller or seller's agent had an obligation to disclose only those defects known by the seller that could not be readily discovered by a reasonable inspection. Blake v. JohnDoe I (1993), 89 Ohio App.3d 130, 133. Buyers were thus responsible for discovering patent defects, but sellers were bound to disclose latent defects, unless the buyer contractually agreed to take the property "as is." Kaye v. Buehrle (1983), 8 Ohio App.3d 381; Mancini v. Gorick (1987), 41 Ohio App.3d 373.
R.C. 5302.30 eliminates the patent/latent defect distinction by requiring sellers to complete a comprehensive disclosure form on the physical condition of the property. Material matters relating to the physical condition of the property to be transferred are itemized under the disclosure form, including, as set forth above, the condition of the structure of the property, including the roof, foundation, walls, and floors. In addition, there is a catch-all section requiring disclosure of any material defects in the property that are within the actual knowledge of the transferor. R.C. 5302.30(D). The disclosure form provides that it is not a substitute for any inspection and that the buyer is encouraged to obtain his or her own professional inspection. The statute requires sellers to make disclosures in good faith, which is defined as "honesty in fact." R.C.5302.30(A)(1) and (E)(1).
There was initially some disagreement among Ohio appellate courts on the issue of whether liability for failure to disclose a material defect listed under R.C. 5302.30 could arise if the defect in question was open and obvious and easily detected. In other words, did some measure of caveat emptor underLayman survive enactment of the statute insofar as patent defects need not be disclosed on the disclosure form. Some courts initially held that such patent defects need not be disclosed on the form, essentially reducing R.C. 5302.30 to codification of the common law as expressed in Layman. See, e.g., Osinski v. Kornja
(Feb. 19, 1998), Cuyahoga App. No. 72129, unreported. The better and more widely accepted view, however, is that caveat emptor now only applies to the patent conditions not enumerated by the statutory requirements of R.C. 5302.30. Belluardo v. Blankenship
(June 4, 1998), Cuyahoga App. No. 72601, unreported; Akl v. Maher
(Dec. 30, 1996), Lucas App. No. L-96-125, unreported. It has been stated that "the statute's requirement that sellers disclose defects in good faith, meaning honesty in fact, would seem to be inconsistent with an interpretation that would allow sellers to omit obvious defects when completing the disclosure form."Harpest v. Parrott (Oct. 8, 1999), Miami App. No. 99CA20, unreported.
The court in Harpest, a case with remarkably similar facts to the one before us, went on to reason that, for purposes of establishing fraud by the seller, the distinction between patent and latent defects remain material because, in a fraud action, the plaintiff must establish justifiable reliance on the seller's misrepresentation or concealment of a defect. InHarpest, the buyers discovered significant plumbing defects in the home which were manifested in the crawl space. Access to the crawl space, as in the case before us, was through a trap under carpeting in a bedroom closet. The court found that, even though the buyers had been informed of the location of the crawl space access, for purposes of summary judgment, its concealed condition created at the very least a material issue of fact precluding summary judgment on the question of whether the defects in the crawl space were open and obvious to reasonable inspection. "The physical ease with which the [buyers] pulled up the carpet and loosened the access panel after they had purchased the home, was not particularly relevant to the issue of whether someone who did no yet own the home would be reasonably expected to take those steps as part of an inspection." Id. at 15. Since the court in the present case found for appellees on their fraud claim, the distinction between latent and patent defects as applied to the facts of our case must still be considered, despite the fact that R.C. 5302.30 has obviated this difference for nonfraud claims.
In general, in order to state a claim for fraud, a plaintiff must show (1) a material false representation, (2) knowingly made, (3) with the intent of misleading another in reliance upon it, (4) reasonable reliance upon misrepresentation by the plaintiff, and (5) injury caused by the reliance. Schwartzv. Capital Savings Loan Co. (1978), 56 Ohio App.2d 83, 86. Fraud may be committed not only by affirmative misrepresentation or concealment, but by nondisclosure where there is a duty under the circumstances to disclose. Jacobs v. Racevskis (1995),105 Ohio App.3d 1, 5.
The record here discloses there was competent, credible evidence before the trial court in the form of testimony from the plaintiffs that they were never shown the access to the crawl space. Regardless of whether the buyers were put on notice of the existence of a crawl space, either through observation of the home exterior or through a notation on the MLS listing form, we are unwilling to state that, as a matter of law, a crawl space which can be accessed only through a hatch located beneath tacked-down carpeting in a back bedroom closet is so open and obvious that it invites inspection by a reasonably diligent purchaser. The trial court chose to believe the testimony of appellees' expert and disregard that of appellant. Pursuant to the testimony of this expert, the location of the wood stove, combined with the lack of structural support beneath the floor constituted a defect. Because of the difficulty of access to the crawl space, this defect was properly found to be latent. It is undisputed that Mr. Rieser had personal knowledge of at least the possibility of the floor sagging beneath the stove, since he had previously attempted to forestall or remedy it through the installation of wooden supports in the crawl space beneath the stove. He later removed those supports on the advice of a termite inspector. The trial court chose to make the permissible inference that Mr. Rieser had then installed the camp jack on cement blocks as a further support to the floor. The trial court, in making this inference, relied upon Mr. Rieser's occupancy and control of the property prior to the sale, combined with the Hansons' denial that he had placed the camp jack in position. Again, on matters of directly conflicting evidence, we must give due deference to the trier of fact's assessment of the credibility of the witnesses. There was competent, credible evidence to support the trial court's conclusion that Mr. Rieser had actual knowledge of the defective condition when he elected not to disclose it upon the residential property disclosure form mandated by R.C. 5302.30.
We accordingly find, with respect to Mr. Rieser, that a material false representation was knowingly made on the residential property disclosure form, and there was reasonable reliance thereupon by appellees based upon the concealed nature of the defect. The trial court's finding of all the elements of fraud in the present case is therefore not against the manifest weight of the evidence with respect to Mr. Rieser.
With respect to Mrs. Rieser, we find otherwise. The uncontroverted testimony before the trial court was that Mrs. Rieser had moved into the property upon her marriage some four years after the purchase of the house and installation of the wood burning stove by Mr. Rieser and the corresponding support work performed in the crawl space. Mrs. Rieser testified, as did her husband, that she had never descended into the crawl space herself. She had never seen any cracking in the ceiling or interior walls corresponding to the defect caused by the weight of the stove. Although Mrs. Rieser signed the residential property disclosure form, there was insufficient evidence before the trial court to establish that Mrs. Rieser had actual knowledge of the defect. The evidentiary elements which allowed the trial court to make an inference regarding Mr. Rieser's knowledge of the facts are not present with Mrs. Rieser. We therefore find that the elements of fraud were not met with respect to any misrepresentation by Mrs. Rieser, nor was she liable for any negligence for her statements on the disclosure form. The trial court therefore did err in entering judgment against Mrs. Rieser jointly with her husband. Appellants' second assignment of error has merit and is sustained.
Appellants' fourth assignment of error asserts that the trial court erred in not recognizing the agency relationship of appellees with their real estate agent and the FHA inspector, and imputing knowledge available to those persons to appellees. Specifically, appellants argue that the existence of the crawl space was fully disclosed to the real estate agent through the multiple listing service form, and that the FHA inspector had full access to the home, but found no structural defects. As discussed in connection with appellants' second and third assignments of error, bare disclosure of the existence of the crawl space is insufficient in the present case to allow us to find that, as a matter of law, appellees were bound to disregard the residential property disclosure form's statement that there was no structural defect with the floor, and conduct their own inspection. While it might have been prudent to do so, this does not of itself, on the facts of this case, preclude a finding of concealment or misrepresentation. Appellants' fourth assignment of error is accordingly overruled.
In accordance with the foregoing, appellants' first, third, and fourth assignments of error are overruled. Appellants' second assignment of error is sustained. The decision of the trial court is therefore affirmed in part, reversed in part, and this cause is remanded to the trial court for modification of its judgment in accordance with this opinion.
Judgment affirmed in part; reversed in part; cause remanded.
BRYANT and TYACK, JJ., concur.